MAZIN A. SBAITI, ESQ.
CA Bar No. 275089
mas@sbaitilaw.com
SBAITI & COMPANY PLLC
2200 Ross Avenue – Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| BENJAMIN POULADIAN, AARON GOLDMAN, DAVID MEAD, DR. VIJAYKUMAR AGRAWAL, TIMOTHY MCKILLICAN, ZI XU, DANIEL POGREBINSKY, and KENT MAGUIRE,<br><br>*Plaintiffs,*<br><br>v.<br><br>VICOR CORPORATION and PATRIZIO VINCIARELLI,<br><br>*Defendants.* | Case No. _____<br><br><br><br><br><br><br>**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT AND JURY DEMAND** |

## I.

## **INTRODUCTION & SUMMARY**

Plaintiffs were short sellers of Defendant Vicor Corporation [NASDAQ: VICR]'s stock [NASDAQ: VICR] during June and July 2023. On July 25, 2023, Defendant Patrizio Vinciarelli—the CEO of Vicor Corporation at the time and continuing to this day—announced on a call that Vicor Corporation had entered into a substantial contract with one of its "significant" *existing* customers which would ramp up at the end of the year in the fourth quarter. Given that it was already known that Vicor Corporation's two major customers were Nvidia and Google, the stock shot up almost immediately. Relying on the news and the price increase, each Plaintiff was forced

PLAINTIFFS' ORIGINAL COMPLAINT                                              PAGE 1

to cover their short positions—which included certain derivative securities for some, suffering substantial losses.

On its Q3 investor call held on October 24, 2023, Vicor Corporation announced further struggles, and for the first time revealed the truth that was no "significant customer" contract, and that any growth was expected to occur in the "medium to long term"—meaning,2025 or 2026. Overnight, the stock came careening back down and settled well below where it had been three months earlier—at or near the price that Plaintiffs believed they would have covered their shorts for a significant profit.

Plaintiffs are entitled to damages for breaches of Section 10b of the Exchange Act and Rule 10b-5.

## II.
## THE PARTIES

**1.** Plaintiff Daniel Pogrebinsky is an individual citizen of the State of California who resides in San Mateo County.

**2.** Plaintiff Benjamin Pouladian is an individual citizen of the State of California who resides in Los Angeles County.

**3.** Plaintiff David Mead is an individual citizen of the State of Washington who residesin King County.

**4.** Plaintiff Aaron Goldman is an individual citizen of the State of New Jersey who resides in Bergen County.

**5.** Plaintiff Dr. Vijaykumar Agrawal is an individual citizen of the State of Tennessee who resides in Memphis County.

**6.** Plaintiff Kent Maguire is an individual citizen of the State of Kentucky who resides in Louisville County.

**7.** Timothy McKillican is an individual citizen of Canada who resides in Ontario, Canada.

**8.** Zi Xu is an individual citizen of Canada, and is domiciled in Dubai, United Arab Emirates.

1  (each noted plaintiff hereabove individually a "Plaintiff,", collectively, "Plaintiffs").

2  **9.** Defendant Vicor Corporation ("Vicor") is a Delaware corporation with its principal place of business at 25 Frontage Road, Andover, MA 01810 (Suffolk County), where it can be served with process or through its registered agent, CT Corporation System, 330 N. Brand Boulevard, Glendale, California.

**10.** Defendant Patrizio Vinciarelli ("Vinciarelli"), who is the CEO of Vicor, is a citizen of the State of Massachusetts and resides in Suffolk County, MA. He can be served in person wherever he may be found.

### III.
### JURISDICTION AND VENUE

**11.** This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

**12.** Venue is proper in this Court because at least one Plaintiff resides in this district and division, Defendant regularly does business in this District via its place of business in Santa Clara, California, and a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of the property that is the subject of the action is situated in this District.

**13.** Personal jurisdiction is proper over the Defendants under 15 U.S.C. § 78aa because of Defendants' actions promoting and discussing its stock on a nationwide broadcast and with national investors, because Defendants directed false and fraudulent communications to the State of California, and because Defendant regularly does business in this district.

### IV.
### FACTUAL BACKGROUND

**A. THE SHORT STORY ABOUT VICOR**

**14.** Defendant Vicor Corporation was founded by Patrizio Vinciarelli in 1981.

**15.** It claims that it designs, develops, manufactures, and markets modular power components and complete power systems for delivering electrical power for deployment in high performance computing, industrial equipment and automation, robotics, unmanned and manned

vehicles, and satellites, among other areas.[1]

**16.** Vinciarelli has been President and CEO since founding Vicor.

**17.** Vicor's shares are actively traded on the NASDAQ stock exchange with around a million shares trading every day—and during the relevant time frame the number of shares exceeded 4.5 million shares in a single day.

**18.** Vicor is followed and rated by several analysts, including, but not limited to, Craig-Hallum, Needham, CJS Securities, BWS Securities, and Northland Capital Markets.

**19.** One of Vicor's significant feats early on was having its power conversion components featured as part of Nvidia's Artificial Intelligence chips—Nvidia's Flagship Datacenter AI GPUs and on Google's 48V server infrastructure.[2] When Nvidia's new AI chips emerged in 2022, Vicor's shares slid over 20% starting on March 23, 2022, and continued thereafter.[3]

**20.** Nvidia and Google had been Vicor's largest and most significant customers. Both are located in this district. But by early 2023, market commentators were questioning the continued reliability of the relationship between Vicor and Nvidia or Google.[4]

**21.** Vicor repeatedly failed to achieve milestones, its order backlog shrunk with new orders not replacing old ones, and revenue declined. Yet Vicor's stock appeared overvalued given the downturn in the business.

**22.** Accordingly, Plaintiffs and others similarly situated looked at the situation as a good thesis for shorting Vicor's stock.

**23.** Each Plaintiff took several short positions over the course of approximately 12 weeks starting on or around May 1, 2023, and holding through July 26, 2023, or after.[5]

---

[1] https://www.vicorpower.com/about-the-company (last visited, 5/18/2024).

[2] https://seekingalpha.com/article/4179454-vicor-ais-pure-play-datacenter-acceleration-power-arms-dealer?ref=the-razors-edge.ghost.io (last visited, 5/18/2024).

[3] https://www.nasdaq.com/articles/why-vicor-shares-powered-off-today (last visited, 5/18/2024).

[4] https://the-razors-edge.ghost.io/vicor-short-thesis-ai-chip-mania-accelerates-vicors-competitive-demise-provides-an-asymmetric-short-opportunity/(last visited, 5/18/2024).

[5] Plaintiffs' purchases and sales are appended hereto in Exhibit A and incorporated herein by reference.

B. **The Short-Lived Fraud Casts a Long Shadow**

24.     Shortly before trading closed on July 25, 2023, Vicor released its 2nd Quarter earnings report. Its press release on that day concluded, critically, that:

> *Commenting on second quarter performance, Chief Executive Officer Dr. Patrizio Vinciarelli stated: 'Q2 bookings remained weak, ahead of production release of an AI platform with a Lateral Power Distribution Network ("PDN") using a 4G ChiP-set, now expected to ramp in Q4. The same 4G ChiP-set will support a more adept Lateral-Vertical PDN, enabling a reduction of nearly 100W in total power consumption at heavy workloads and superior processor performance.'*[6]

25.     During Vicor's 2023 second quarter earnings call on the evening of July 25, 2023, after the market closed for the day, the following exchange occurred between Quinn Bolton, an analyst on the call who followed Vicor and Defendant Vinciarelli, President and CEO of Vicor:

> **[Analyst] Quinn Bolton:**
>
> *Okay, great. First question is, can you guys share any more details on the 4G lateral power distribution design that you mentioned in the press release for a new AI platform that ramps in the fourth quarter Can you say, is this a new customer? Have you worked with this customer previously? Can you give us any sense of what our consumption is for this part? Is it a high power card? Is it a mid-range power card? Any details you can share would be very helpful.*
>
> **Patrizio Vinciarelli**
>
> ***It's an existing customer. It's a new generation for the existing customer.*** *And it's a chipset that can be deployed either in a lateral PDN, which is substantially handicapped from a power system perspective to the point that it limits power delivery, power capability, process of performance, in that it gives rise to large losses within the copper of the substrate to the GPU, that it powers. It gives rise to further losses within the system itself, or into the limitations of lateral power delivery applied at the 1,000 amp level. With a 4G*

---

[6] https://vicorcorporation.gcs-web.com/news-releases/news-release-details/vicor-corporation-reports-results-second-quarter-ended-june-12.

PLAINTIFFS' ORIGINAL COMPLAINT                                                                                PAGE 5

> *chipset, we can enable a lateral solution with the same handicaps, or with a vertical element using the same chipset, a lateral vertical solution, which is unique, highly differentiated, in that it improves system efficiency by about 10%. And it improves a number of limitations relating to process of performance.*

**26.** Thus, it was obvious that the market had focused on the positive news of a new generation product for a customer, and they wanted to know the what the growth prospects were for this product.

**27.** On that same call, the following exchange occurred between another analyst, John Dillon, and Vinciarelli:

> **John Dillon**
>
> *Okay, great. I want to follow up on Quinn's question a little bit. Regarding the, can you hear me now better? Regarding the lateral vertical opportunity that's coming to production in Q4, is that a high-volume customer is more of a lower volume or more of a modest volume customer?*
>
> **Patrizio Vinciarelli**
>
> *So, to be clear, I've suggested earlier, the same chip set, which is a 4G chip set, supports both the lateral and the lateral vertical. Based on constant input expectation, as of now, is that the lateral implementation will go first. And that's the one we're anticipating for the Q4 ramp. I can't tell you when the lateral vertical was going to production, but my expectation is that it would be after the lateral.*
>
> **John Dillon**
>
> *Yes, but is this going to be a significant customer or is this more of an incremental volume that you're going to expect?*
>
> **Patrizio Vinciarelli**
>
> ***This is a significant customer***.

[bolding added].

28. Throughout the call, Vicor admitted its poor performance and poor prospects (namely the radical decrease in orders) but Vinciarelli explicitly touted that a customer who was a "significant" customer and an "existing" customer was "expected to ramp in Q4[2023]" with this new product.

29. Vicor's management—Vinciarelli included—gave specific details regarding the customer, such as that they would likely use the lateral PDN implementation first and then use the lateral-vertical PDN implementation later, that they were an "existing" customer seeking the "new generation" part, and that they were a "significant" customer. Management gave additional specific details that the customer would have power delivery "applied at the 1,000 amp level".

30. The market plainly took this to suggest that Vicor had a deal it was pursuing again with Nvidia, Google, or a similarly large player.

31. The market's reaction to this news was immediate and obvious: Whereas Vicor's stock had closed on July 25, 2023, at $59 before the above earnings announcements, Vicor opened the next morning on July 26, 2023, at $77.40 and closed at the end of the day at $93.70.

32. Average trading volume prior to, and right after, July 26, 2023, had been consistent at around 800,000 to 1.2 million shares per day; on July 26, 2023, volume exceeded 4.5 million shares.

33. Because of the skyrocketing price and in reliance on the announcement of a new "significant customer" who was also an "existing customer," each Plaintiff was forced to cover their short positions at a significant loss—roughly $35 per share on average, in addition to the roughly $15 per share they would have realized had they not had to cover their shorts.

34. Plaintiffs were put in the position of covering their shorts in reliance on the news and the market's internalization of that news overnight.

C. **The Truth Reveals How Little the Market Thought of Vicor**

35. On October 24, 2023, Vicor held its earnings call for the end of the third quarter. The following material exchanges occurred:

>**[Analyst] Quinn Bolton**
>
>*Last quarter you guys seemed pretty excited about this new AI platform that you expected to ramp in the fourth quarter of 2023 and throughout 2024. Can you just give us any updates on that program? How are you feeling about it, is it still on track? Have you started to see more bookings associated for that?*
>
>**[Vicor Sr. VP of Sales] Philip D. "Phil" Davies**
>
>*So, Quinn, this is Phil. So, the first part of your question, I think, was what we talked about the last call. And my prepared remarks, I basically said that the first area of focus was to ramp in Q4, our 48-volt bus converters, and factorized power solutions. I hope that answers that question pretty clearly.*
>
>*…As I said, we're having substantial conversations now with customers that will diversify us away from the two big guys that we've been doing business with, for the next - for the last few years. So, as I said, I'm very confident in the future and where we stand and it's a bit of a complex landscape.*

36. As Phil Davies was obviously attempting to retreat from the prior call's promises, he then contradicted them. John Dillon, the analyst from the initial call jumped in to get further clarification:

>**John Dillon**
>
>*On the last call, you stated you had a lateral and a lateral-vertical opportunity with a major GPU customer. I was wondering, was that for the same GPU or was it for two separate GPUs?*
>
>**Phil Davies**
>
>*So what we talked about there was that we have lateral and lateral-vertical solutions for not just one customer. We are bringing that solution forward, and we have customers looking at that, both of those solutions. And certainly, the number of customers looking at lateral deployment is a little bit higher than the number with lateral-vertical, but we have both.*

**Patrizio Vinciarelli**

*And that's also the way in which systems have evolved, but make no mistake. The future, and the future is coming next year, is no longer with lateral PDNs.*

*….*

**John Dillon**

*Got it. So, with the one major customer though, do they have two different designs with you? One for...are they working with two different...the one customer, do they two different GPUs that are going to be used, in one using lateral, the other's going to be using lateral-vertical? Or is the same GPU that's initially going to use lateral, then going to lateral-vertical?*

**Patrizio Vinciarelli**

*John, we're not going to talk about any one customer. I'm sorry, but bear with us, that's not a level of specificity we want to get involved with.*

*….*

**[Analyst] Richard Shannon**

*Hi, Richard Shannon with Craig-Hallum. Let's see, a couple of questions. Maybe a follow-up on the topic of bookings here. I think last quarter, you felt fairly confident that the backlogs would improve either in the ending third quarter or fourth quarter. Now, it seems you're less certain of that. And I think if I understood one of the answers to a prior question, you're still expecting the design with a major customer to -- that is still active here. So it seems like a couple of simple explanations for that would be either that design is delayed or your share of the size of the opportunity is more limited than what you initially had thought or potentially there's other reasons. So can you help us understand those dynamics relative to your last conference call?*

**Patrizio Vinciarelli**

*I think I made clear that we really don't want to go into the level of detail. And to be clear, well, I appreciate the reason for the interest, the curiosity, it's really*

*got very little to do with Vicor's opportunity in the medium and long term. And that's what we're really focused on.*

**37.** Thus, when pressed to update the public statement made on July 25, 2023, that a "significant" and "existing" customer who was planning to use two different kinds of implementations at the "1,000 amp level" would ramp up in the fourth quarter, Vicor essentially denied the existence of any such customer and pivoted to talk about *no specific customer*, disclosing only that they were "having substantial conversations with customers who will diversify us away from the two big guys we've been doing business with."

**38.** In other words, in three months it went from one of the two "big guys" was going to be ramping up a new product with Vicor by fourth quarter of 2023, to Vicor was talking to other customers to get away from relying on business with the "two big guys." This corrective disclosure made clear to the Plaintiffs and to the market that the promised fourth quarter "ramp in" of a "significant customer" was never going to happen. Indeed, it never did.



39.     As shown in the above figure, the price for Vicor immediately fell over 20%. Vicor closed on October 24, 2023, at $53.19. After the after-hours earnings call, Vicor opened the next day on October 25, 2023, at $39.01.

40.     Whereas the number of shares trading on the days prior to October 24, 2023, were in low million range, the volume again exceeded four million shares on October 25, 2023, as people exited, and then settled down to normal in the following days.

## V.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATIONS OF SECTION 10b of the Exchange Act AND RULE 10b -5(b)
### AGAINST ALL DEFENDANTS

41.     The factual allegations in this Complaint are hereby incorporated by reference as if fully set forth herein.

42.     Plaintiffs' allegations amount to (i) manipulation or deception (through misrepresentation and/or omission); (ii) materiality; (iii) "in connection with" the purchase or sale of securities, (iv) scienter, (v) causation, and (vi) damages.

43.     Based upon the facts alleged herein, Defendants violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchases and sales of Vicor common stock by the Plaintiffs: (a) used or employed manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; (c) employed devices, schemes, and artifices to defraud; and/or (d) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon Plaintiffs.

44.     Defendants engaged in a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and/or maintain the market price of Vicor's shares; and (iii) caused Plaintiffs and other members of the Class to sell Vicor common stock at artificially inflated and/or maintained prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

**45.** Pursuant to the above, plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in making the false statements, and in the preparation and/or issuance of the annual reports, quarterly results announcements, SEC filings, press releases, and other statements and documents which omitted to correct the disclosure. Such reports, filings, releases and statements contained untrue statements of material facts and/or failed to disclose material information necessary to make the statements made not misleading.

**46. Deception**: Plaintiffs have specifically identified the time, place, manner and content of the deceptive statements, and why they were false. In summary, on July 25, 2023, Vicor promised that it was going to be ramping up a new product with an existing and significant customer by the fourth quarter of 2023, which it believed would solve the problem that Vicor had few orders and its backlog had shrunk by 50 percent. This representation was false when made because no such customer ever existed. Three months later, Vicor confirmed that no such customer relationship existed, pivoting to state that rather than ramping up with their significant existing customer, Vicor was looking to "diversify away" from them, and that the backlog issue was not going to be solved anytime soon. Vicor furthermore failed to correct any of the misstatements in the intervening period, and its SEC filings materially omitted any corrections.

**47. Materiality**: Defendants' misrepresentations were hugely material because they fundamentally changed the total mix of information about Vicor in the market and had a direct and immediate impact on market price for Vicor stock and on derivatives keyed to Vicor's stock price.

**48.** Right after the false positive news Vicor's stock shot up from $59 to $77.40 <u>overnight</u>, and the next day it saw over 3 million more shares trading than normal. Also, Defendants own press release highlighted the lack of orders and the shrinking backlog of orders, which, absent positive news about a new large customer who would soon be making a large amount of purchases, would have caused the stock to decline—indeed, the stock nosedived overnight after the corrective disclosure to $39, and the next day again saw over 3 million more shares trading than normal.

**49.** **In connection with the purchase or sale of securities**: The fraud was made in connection with Plaintiffs' short sales and purchases of Vicor's stock to cover their short positions, and in connection with Plaintiffs' purchase and sales of derivative securities keyed to Vicor's stock that were intended to give Plaintiffs further exposure as a short position to Vicor's shares.

**50.** **Scienter**: Vicor's fraudulent misrepresentations were made with actual knowledge of their falsity or at a minimum with reckless disregard of their falsity because of the degree of specificity provided on the June 25, 2023 earnings call. Defendant Vinciarelli actively made the misstatements, and he, of all people, should have known whether or not an "existing" and "significant customer" would be ramping up in the fourth quarter of 2023 with a "next generation" product, with specific next generation features, that was going to change Vicor's fortunes in the short term (four or so months away). His knowing and active participation in making the misrepresentations and disseminating it to the investing public is concrete and clear and specific evidence of his knowledge or recklessness.

**51.** If Vicor did not have actual knowledge of the misrepresentations and/or omissions alleged, then they were reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading, or by being reckless in failing to install the most basic controls necessary to insure that only truthful statements were made.

**52.** Defendants had immediate access to the truth: Vicor either did or did not have a concrete enough deal with an "existing" and "significant" customer as of July 25, 2023, to announce that it would materialize in a matter of months (e.g., by the fourth quarter which is October to December). And given the exposure to the securities laws and the length of time Vicor has been publicly traded, the failure to simply refrain from misrepresenting the status of the company's relationship with a "significant customer" is unforgivable—it represents an elementary violation of the most fundamental commandments: tell no lies.

**53.** **Causation**: At the time of the above misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true. Each Plaintiff relied on the statements made during the July 25 investor call and/or relied on the impact that call had on the market price

for Vicor's securities in deciding to cover their short positions—or being forced to do so, and/or incurring the costs of doing so—including having to sell other profitable positions to cover the difference.

54. Had each Plaintiff and/or the marketplace known of the truth regarding the lack of a significant customer ramping up with a new generation product in the fourth quarter, which was not disclosed by Defendants, Plaintiffs would not have purchased Vicor's shares, or, if they had purchased them eventually to cover their short positions, they would not have done so at the artificially inflated and/or maintained prices that they received to cover their short positions. Plaintiffs also would not have had to take to cover their positions via derivative securities.

55. **Damages:** Each Plaintiff is entitled to damages equal to (a) the cost to cover based upon the market's reaction to the fraudulent statements and the consequences of doing so (including liquidation), and (b) the lost gain each Plaintiff would have experienced from the stock falling to, at least, $32 the way it did during in the weeks after the corrective disclosure.[7]

56. There is a liquid market for Vicor's shares and derivatives therein, given that the shares are traded on a major stock exchange—NASDAQ—which is a highly efficient and liquid automated market with rules for minimum liquidity. On the days in question large volumes of trades were made. Vicor is an SEC reporting company in good standing with several analysts actively following the stock. As a result of the foregoing, and as reflected in the trading data above, the market for Vicor's shares promptly digested current information regarding Vicor's business from all publicly available sources and reflected such information in the market prices for the stock.

57. The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when

---

[7] *See* Exhibit A incorporated herein.

1   made, and there were no meaningful cautionary statements identifying important factors that could
2   cause actual results to differ materially from those in the purportedly forward-looking statements.

3   **58.** In the alternative, to the extent that the statutory safe harbor is determined to apply
4   to any forward-looking statements pleaded herein, Defendants are liable for those false forward
5   looking statements because at the time each of those forward-looking statements was made, the
6   speaker had actual knowledge that the forward-looking statement was materially false or
7   misleading, and/or the forward-looking statement was authorized or approved by an executive
8   officer who knew that the statement was false when made.

9   **59.** By virtue of the foregoing, Vicor and Vinciarelli each violated Section 10b of the
10  Exchange Act and Rule 10b-5 promulgated thereunder by making false statements and omitting
11  to correct any misstatements to make them not materially misleading.

12  **60.** Defendants are liable directly and indirectly for their violations of Section 10(b)
13  and Rule 10b-5 for the wrongs complained of herein.

14  **61.** As a direct and proximate cause of their violations, Plaintiffs suffered damages in
15  connection with their purchases and sales of Vicor stock.

**COUNT TWO**
**VIOLATIONS OF SECTION 20 OF THE EXCHANGE ACT**
**AGAINST VINCIARELLI**

**62.** The factual allegations in this Complaint are hereby incorporated by reference as if fully set forth herein.

**63.** Vinciarelli acted as a controlling person of Vicor within the meaning of Section 20(a) of the Exchange Act as alleged herein.

**64.** Vinciarelli, acting as Vicor's CEO and President, made the misrepresentations on behalf of Vicor.

**65.** By virtue of his high-level positions with Vicor, participation in and/or awareness of the company's operations, and intimate knowledge of the false statements made on behalf of the company and disseminated to the investing public, Vinciarelli had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vicor,

including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

**66.** Vinciarelli was provided with or had unlimited access to Vicor's contracts, reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**67.** Therefore, Vinciarelli is liable personally as a control person under Section 20 for Vicor's violations of the Exchange Act.

**68.** As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and sales of Vicor's common stock.

## VI.

## CLASS ALLEGATIONS

**69.** Plaintiffs propose a class certified under Rule 23(a) and (b)(3) to represent themselves and all those similarly situated for all persons who were shorted Vicor stock prior to and on July 25, 2023, and covered their shorts in the days following up to and including October 24, 2023 (the "Class Period").

**70.** Plaintiffs believe that, given the number of shares traded, the number of potential class members is so numerous that it would be impractical to join all potential class members.

**71.** Plaintiffs are typical of the members of the class because they shorted the stock and then covered their shorts on or after July 26, 2023. No Plaintiff is subject to a unique defense or claim.

**72.** Plaintiffs are adequate to represent the class because they have no conflicts of interest, have no interest(s) other than their own interests in their claims, and have hired competent and experienced class counsel.

**73.** All class members have suffered the same injury, although damages may differ, and so the following represent common questions for the class:

- Whether Vicor made material misrepresentations of fact on or about July 25, 2023, with regards Vicor's prospects involving a new customer who would be "ramped in" by the fourth quarter;
- Whether Vicor's misrepresentations were knowingly or recklessly made;
- Whether Vicor's misrepresentations caused the market price for Vicor to inflate;
- Whether Vicor's misrepresentations proximately caused Plaintiffs' and the Class's damages and the general extent of such damages; and
- Whether the acts or omissions herein violated Sections 10(b) and 20 of the Exchange Act and Rule 10b-5;

**74.** Bringing all claims of the Class is superior in a single action that would be in multiple actions for the fair and efficient adjudication of all claims and since joinder of all claims would be impracticable. It is also superior because the individual claims are relatively small in comparison to the costs of litigation, making the burden and expense of individualized litigation prohibitive if each claim were to be pursued on its own.

**75.** There will be no difficulty in managing this lawsuit.

**76.** The class would be entitled to a presumption of reliance on the fraud-on-market theory under *Basic v. Levinson*. As already pleaded, Plaintiffs and the Class purchased the Vicor shares relying on the integrity of the market price for Vicor's shares, as reflected by the information available to the market. There is a liquid market for Vicor's shares given that the shares are traded on a major stock exchange—NASDAQ—which is a highly efficient and liquid automated market with rules for minimum liquidity. On the days in question large volumes of trades were made. And Vicor is an SEC reporting company in good standing with several analysts actively following the stock. As a result of the foregoing, and as reflected in the trading data above, the market for Vicor's shares promptly digested current information regarding Vicor's business from all publicly available sources and reflected such information in the market prices for the stock. Under these circumstances, purchasers of Vicor's shares during the Class Period suffered similar injuries through their purchases. Therefore, Plaintiffs and the Class are entitled to a presumption of reliance under *Basic v. Levinson*, 485 U.S. 224 (1988).

**77.** A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Whatever kernel of truth there may have been in the statements made on July 25, 2023, Defendants made material omissions to descrive or properly qualify what they were representing in order to make their statements not false or misleading.

**78.** Because this action involves Defendants' failure to disclose materially adverse information regarding the Vicor's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### VII.
### PRAYER FOR RELIEF

**79. WHEREFORE**, Plaintiffs demand a trial by jury and requests that the Court enter an order certifying a class and finding Defendants liable, and awarding Plaintiffs and the Class damages for their losses in an amount determined by the trier of fact, as well as attorneys' fees, expert fees, costs and expenses, as permitted under law or equity, and all other relief to which they are entitled and/or that the Court deems just, legal, equitable and proper.

Dated: July 11, 2024                    **SBAITI & COMPANY, PLLC**

                                        */s/ Mazin A. Sbaiti*
                                        Counsel for Plaintiffs
                                        Email: mas@sbaitilaw.com