MAZIN A. SBAITI, ESQ.
CA Bar No. 275089
mas@sbaitilaw.com
SBAITI & COMPANY PLLC
2200 Ross Avenue – Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| | § **Case No. 3:24-cv-04196-RS** |
| | § |
| **IN RE VICOR SECURITIES** | § **PLAINTIFFS' FIRST** |
| **LITIGATION** | § **AMENDED** |
| | § **CONSOLIDATED CLASS** |
| | § **ACTION COMPLAINT** |
| | § **AND JURY DEMAND** |

## INTRODUCTION

Plaintiffs were short sellers of Defendant Vicor Corporation's common stock [NASDAQ: VICR] in 2023. On July 25, 2023, Co-Defendant Patrizio Vinciarelli—the CEO of Vicor Corporation at the time and continuing to this day—communicated that the company had entered into a new agreement with a large existing customer for its next generation 4G lateral power distribution design that Vicor expected to start delivering in the fourth quarter of 2023. This was the first positive news for Vicor in a while. And given that it was already generally known that Vicor Corporation's two major customers were Nvidia and Google, investors were understandably excited, and the stock price shot up immediately. Relying on the news and the concomitant price increase, each Plaintiff was forced to cover their short positions, which for some included derivative securities, and suffered substantial losses.

The July 25th announcement was false, and the proof is in the cover up. When Vicor and Vinciarelli were confronted about their misstatements, they headed for the familiar refuges that people who don't tell the truth run for —first they denied saying what they said, and then a year later after this lawsuit was filed, they admitted saying it but tried to explain what they *really* meant.

Indeed, during its October 24, 2023, third-quarter investor call, less than three months after announcing the significant customer deal, Vicor announced continued struggles and never brought up the customer. And when pressed for an update on that, Vicor did not mention that the customer changed its mind, it dodged and pivoted—Vicor denied ever having represented that it had a significant customer contract, insisting that any growth was solely expected to occur in the "medium to long term"—*e.g.*, 2025 or 2026—from locating and selling to *new unidentified customers*. Immediately, the stock price careened down and settled well below where it had been on July 25—at or near the price that Plaintiffs believed they would have covered their short positions.

Plaintiffs are entitled to damages.

## PARTIES

**1.**     Plaintiff Daniel Pogrebinsky is an individual citizen of the State of California who resides in San Mateo County.

**2.**     Plaintiff Benjamin Pouladian is an individual citizen of the State of California who resides in Los Angeles County.

**3.**     Plaintiff David Mead is an individual citizen of the State of Washington who resides in King County.

**4.**     Plaintiff Aaron Goldman is an individual citizen of the State of New Jersey who resides in Bergen County.

**5.**     Plaintiff Dr. Vijaykumar Agrawal is an individual citizen of the State of Tennessee who resides in Memphis County.

**6.**     Plaintiff Kent Maguire is an individual citizen of the State of Kentucky who resides in Louisville County.

7.      Timothy McKillican is an individual citizen of Canada who resides in Ontario, Canada.

8.      Zi Xu is a citizen of Canada and is domiciled in Dubai, United Arab Emirates.

9.      Each Plaintiff hereabove individually is referred to a "Plaintiff" and collectively, "Plaintiffs".

10.     Defendant Vicor Corporation ("Vicor") is a Delaware corporation with its principal place of business in Massachusetts. Vicor has been properly served and has agreed to answer this Complaint within sixty days of its filing.

11.     Defendant Patrizio Vinciarelli ("Vinciarelli", together with Vicor, "Defendants"), the CEO of Vicor, is an individual citizen of the State of Massachusetts who resides in Suffolk County. He has been properly served and has agreed to answer this Complaint within sixty days of its filing.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a).

13.     Venue is proper in this Court because at least one Plaintiff resides in this district and division, Vicor regularly does business in this district via its place of business in Santa Clara, California, and a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of the property that is the subject of the action is situated in this district. Additionally, Nvidia and Google—Vicor's largest and most significant customers whose transactions (or lack thereof) are supposedly undergirding the issues in this case—are located in this district.

14.     Personal jurisdiction is proper over Defendants because of Defendants' actions promoting and discussing its stock on a nationwide broadcast and with national investors, because Defendants directed false and fraudulent communications to the State of California, and because Defendant regularly does business in this district.

# FACTUAL BACKGROUND

## A. THE SHORT STORY ABOUT VICOR

**15.**    Vinciarelli founded Vicor in 1981.

**16.**    Vicor designs, develops, manufactures, and markets modular power components and complete power systems that deliver and/or manage electrical power for deployment in, among other areas, high-performance computing, industrial equipment and automation, robotics, unmanned and manned vehicles, and satellites.[1]

**17.**    Vinciarelli has served as President and CEO of Vicor since its founding.

**18.**    Vicor's stock is actively traded on the NASDAQ stock exchange.

**19.**    Upwards of a million Vicor shares were traded every day on average between March and October 2023, with that number exceeding 4.5 million in a single day following the disclosures at issue in this lawsuit.

**20.**    Vicor is followed and rated by several analysts, including, but not limited to, Craig-Hallum, Needham, CJS Securities, BWS Securities, and Northland Capital Markets.

**21.**    Previously, Vicor's two largest customers had been Google and Nvidia.

**22.**    One of Vicor's significant feats early on was having its power-management components featured as part of Nvidia's Artificial Intelligence chips—Nvidia's Flagship Datacenter AI GPUs—and in Google's 48V server infrastructure.[2]

**23.**    When Nvidia's new AI chips emerged in 2022 but did not feature Vicor's power designs or components, Vicor's shares slid over 20%, starting on March 23, 2022, with the trend continuing thereafter.[3]

**24.**    By early 2023, many market commentators who follow the industry, and those who follow Vicor specifically, were questioning the continued reliability of the

---

[1] https://www.vicorpower.com/about-the-company (last visited, 5/18/2024).

[2] https://seekingalpha.com/article/4179454-vicor-ais-pure-play-datacenter-acceleration-power-arms-dealer?ref=the-razors-edge.ghost.io (last visited, 5/18/2024).

[3] https://www.nasdaq.com/articles/why-vicor-shares-powered-off-today (last visited, 5/18/2024).

---

relationship between Vicor and Nvidia or Google.[4]

25.   Through July 2023, according to its public SEC filings, Vicor repeatedly failed to achieve expected milestones, its order backlog[5] shrunk with new orders not replacing the older ones as they were delivered, and revenue declined.

26.   For example, on February 22, 2024, Vicor reported in a press release that "Revenues for the fourth quarter ended December 31, 2023 totaled $92.7 million, a 12.2% decrease from $105.5 million for the corresponding period a year ago, and a 14.1% sequential decrease from $107.8 million in the third quarter of 2023" and that "Backlog for the fourth quarter ended December 31, 2023 totaled $160.8 million, a 47.2% decrease from $304.4 million for the corresponding period a year ago, and 8.0% sequential decrease from $174.7 million at the end of the third quarter of 2023."[6]

27.   Soon after that, in its 10Q released in May 2023, Vicor explained that:

> Backlog, which represents the total value of orders for products for which shipment is scheduled within the next 12 months, was approximately $271,283,000 at the end of the first quarter of 2023, as compared to $304,392,000 at the end of the fourth quarter of 2022…
>
> …and
>
> Net revenues decreased 7.3% to $97,816,000 for the first quarter of 2023, from $105,493,000 for the fourth quarter of 2022. Net revenues for Brick Products increased 10.9% compared to the fourth quarter of 2022, primarily due to the ability to shift manufacturing resources to focus on available backlog, as well as favorable market conditions.

---

[4] https://the-razors-edge.ghost.io/vicor-short-thesis-ai-chip-mania-accelerates-vicors-competitive-demise-provides-an-asymmetric-short-opportunity/(last visited, 5/18/2024).

[5] "Backlog…consists of orders for products for which shipment is **scheduled within the following 12 months**, subject to our scheduling and cancellation policies." Vicor 2022 SEC Form 10k at p.7. https://vicorcorporation.gcs-web.com/static-files/3dd8c0e2-9b5f-496f-bbb3-d131f1f98871

[6] https://www.globenewswire.com/news-release/2024/02/22/2834085/0/en/Vicor-Corporation-Reports-Results-for-the-Fourth-Quarter-and-Year-Ended-December-31-2023.html

Advanced Products net revenue decreased 19.3% compared to the fourth quarter of 2022 primarily due to continued supply constraints leading to longer cycle-times and schedule delays.

…

Gross margin decreased to $46,534,000 for the first quarter of 2023 from $49,139,000 for the fourth quarter of 2022, but gross margin, as a percentage of net revenues, increased to 47.6% for the first quarter of 2023 from 46.6% for the fourth quarter of 2022. The decrease in gross margin dollars and the increase in gross margin percentage were primarily a result of the unfavorable impact from lower sales volume offset by reduced freight-in and tariff spending of $3,927,000 (net of approximately $3,000,000 in duty drawback recovery of previously paid tariffs).[7]

28.     Vicor further reported $4.5 million fewer accounts receivable for that period in this same filing. These reflected a continuing trend in Vicor's performance that was cemented by the fact that it had lost its relationship with Nvidia and Google.

29.     Thus, to the common investor, Vicor's stock appeared significantly overvalued given the business's condition. Accordingly, Plaintiffs and others similarly situated looked at Vicor's downward trend as a core thesis for shorting Vicor's stock.

30.     Each Plaintiff—and those similarly situated—took several short positions over the course of approximately twelve weeks starting on or around May 1, 2023.[8]

31.     According to publicly available data, over three million shares had been sold short as of July 25, 2023. This does not include the number of short positions taken by investors via options positions or other derivative instruments such as credit default swaps.

_____

[7] https://vicorcorporation.gcs-web.com/static-files/fc6d988d-9b13-4388-a634-b64b8af13385 at p.18.

[8] Plaintiffs' relevant  short positions and cover purchases are appended hereto in Exhibit A and incorporated herein by reference.

### B. The Short-Lived Fraud Casts a Long Shadow

**32.** Shortly before trading closed on July 25, 2023, Vicor released its Q2 earnings report. Its companion press release on that day concluded with the first bit of real good news in a while:

> Commenting on second quarter performance, Chief Executive Officer Dr. Patrizio Vinciarelli stated: "**Q2 bookings remained weak, ahead of production release of an AI platform with a Lateral Power Distribution Network** ('PDN') using a 4G ChiP-set, now expected to ramp in Q4. The same 4G ChiP-set will support a more adept Lateral-Vertical PDN, enabling a reduction of nearly 100W in total power consumption at heavy workloads and superior processor performance."[9]

**33.** The message was plain: newly booked sales of the Lateral Power Distribution Network (itself a new product) would reverse the lengthy trend of "weak" sales.

**34.** During Vicor's 2023 Q2 earnings call after the market closed that same day, July 25, 2023, the analysts' questions reflected that they received the same message: Good news—a customer had been confirmed for the new product.

**35.** The only question the analysts wanted an answer to was *how big* of a customer.

**36.** For example, Quinn Bolton, an analyst from Needham & Company who follows Vicor, asked Vinciarelli about how large a difference in sales this customer was likely to represent in the fourth quarter:

> **Quinn Bolton:**
>
> *Okay, great. First question is, can you guys share any more details*

---

[9] https://vicorcorporation.gcs-web.com/news-releases/news-release-details/vicor-corporation-reports-results-second-quarter-ended-june-12.  The Press release itself was announced by an 8-k filing on July 25, 2023. https://vicorcorporation.gcs-web.com/sec-filings/sec-filing/8-k/0001193125-23-193449

*on the 4G lateral power distribution design that you mentioned in the press release for a new AI platform that ramps in the fourth quarter. Can you say, is this a new customer? Have you worked with this customer previously? Can you give us any sense of what our consumption is for this part? Is it a high power card? Is it a mid-range power card? Any details you can share would be very helpful.*

**Patrizio Vinciarelli**

***It's an existing customer. It's a new generation for the existing customer.*** *And it's a chipset that can be deployed either in a lateral PDN, which is substantially handicapped from a power system perspective to the point that it limits power delivery, power capability, process of performance, in that it gives rise to large losses within the copper of the substrate to the GPU, that it powers. It gives rise to further losses within the system itself, or into the limitations of lateral power delivery applied at the 1,000 amp level. With a 4G chipset, we can enable a lateral solution with the same handicaps, or with a vertical element using the same chipset, a lateral vertical solution, which is unique, highly differentiated, in that it improves system efficiency by about 10%. And it improves a number of limitations relating to process of performance* [bolding added].

37.    The question posed to Vinciarelli indicated that the market was focusing on the news that the new customer agreement would overcome the prior quarters' weak sales. This was the only real positive news about Vicor in several quarters, and especially during that time frame.

38.    On that same call, an analyst for Goldman Sachs, John Dillon, again attempted to confirm the size of the customer with Vinciarelli who confirmed it was a large customer:

**John Dillon**

*Okay, great. I want to follow up on Quinn's question a little bit. . . . Regarding the lateral vertical opportunity that's coming to production in Q4, is that a high-volume customer is more of a lower volume or more of a modest volume customer [sic]?*

**Patrizio Vinciarelli**

*So, to be clear, I've suggested earlier, the same chip set, which is a 4G chip set, supports both the lateral and the lateral vertical. Based on constant input expectation, as of now, is that the lateral implementation will go first. And that's the one we're anticipating for the Q4 ramp. I can't tell you when the lateral vertical was going to production, but my expectation is that it would be after the lateral.*

**John Dillon**

*Yes, but is this going to be a significant customer or is this more of an incremental volume that you're going to expect?*

**Patrizio Vinciarelli**

***This is a significant customer*** [bolding added].

39.     Throughout the call, Vicor admitted to the poor performance and prospects (namely, the radical decrease in orders in the prior quarters), but Vinciarelli explicitly touted that a "significant" "existing" customer had agreed to make product purchases, the delivery of which was slated to begin in Q4 2023.

40.     Vicor's management—Vinciarelli included—gave specific details regarding the customer as if they were real, *e.g.*, that the customer would use the lateral PDN implementation first and the lateral-vertical PDN implementation later.

41.     Management of Vicor gave additional, specific details that the customer would have power delivery "applied at the 1,000 amp level."

42.     Management reiterated that this concerned an "existing" and "significant" Vicor customer seeking the "new generation" part.

**43.**    These details gave the unmistakable impression that a concrete deal had been reached for an existing—not speculative—large customer of a significant number of purchases in the fourth quarter, which would have reversed Vicor's trend of declining and weak sales.

**44.**    Consistent with the messaging, the market took this information to suggest that Vicor had a new partnership deal with Nvidia or Google.

**45.**    The market's reaction to this news was immediate and pronounced: whereas Vicor's stock had closed on July 25, 2023, at $59 before the above earnings announcements, it then opened the next morning on July 26, 2023, at $77.40 and closed at the end of the day at $93.70, reaching an intra-day high of over $94.

**46.**    Average trading volume prior to and after July 26, 2023, had been consistent at around 800,000 to 1.2 million shares per day; but on July 26, 2023, volume exceeded 4.5 million shares, roughly five to six times higher than normal.

**47.**    Because of the skyrocketing price, and in reliance on the announcement of a new "significant customer" who was also an "existing customer," each Plaintiff was forced to cover their short positions at a significant loss—roughly $35 per share on average, in addition to the roughly $15 per share they would have realized had they not needed to purchase cover.

**48.**    Plaintiffs were forced to cover their short positions in reliance on the news and the market's overnight internalization of the news.

**C.  VICOR COMES UP SHORT AFTER THE TRUTH IS REVEALED**

**49.**    On October 24, 2023, Vicor held its third quarter earnings call.

**50.**    On the call, Vicor failed to mention the customer discussed on the July 25, 2023 call.

**51.**    The analysts' questions again confirmed what everyone had taken away from the July 25, 2023 call: Vicor had a confirmed big customer.

**52.**    In response, Vicor prevaricated.

53.     Vicor did not disclose that its supposed "existing" and "significant" customer had backed out or changed its mind; instead, Vicor denied that it ever said it had such a customer:

**[Analyst] Quinn Bolton**

*Last quarter you guys seemed pretty excited about this new AI platform that you expected to ramp in the fourth quarter of 2023 and throughout 2024. Can you just give us any updates on that program? How are you feeling about it, is it still on track? Have you started to see more bookings associated for that?*

**[Vicor Sr. VP of Sales] Philip D. "Phil" Davies**

*So, Quinn, this is Phil. So, the first part of your question, I think, was what we talked about the last call. And my prepared remarks, I basically said that the first area of focus was to ramp in Q4, our 48-volt bus converters, and factorized power solutions. I hope that answers that question pretty clearly.*

*. . . As I said, we're having substantial conversations now with customers that will diversify us away from the two big guys that we've been doing business with, for the next -- for the last few years. So, as I said, I'm very confident in the future and where we stand and it's a bit of a complex landscape.*

54.     In his attempt to retreat from the prior call's statement that Vicor had already landed a whale of a customer, Phil Davies, a senior manager at Vicor, pivoted away entirely and did not even attempt to explain what happened to the customer.

55.     John Dillon, the Goldman Sachs analyst, jumped in to reassert what was said on July 25th—and again, Vicor attempted to deny ever having made the representation:

**John Dillon**

*So, with the one major customer though, do they have two different designs with you? One for . . . are they working with two*

*different . . . the one customer, do they two different GPUs that are going to be used, in one using lateral, the other's going to be using lateral-vertical? Or is the same GPU that's initially going to use lateral, then going to lateral-vertical?*

**Patrizio Vinciarelli**

*John, we're not going to talk about any one customer. I'm sorry, but bear with us, that's not a level of specificity we want to get involved with.*

.....

**John Dillon**

*On the last call, you stated you had a lateral and a lateral-vertical opportunity with a major GPU customer. I was wondering, was that for the same GPU or was it for two separate GPUs?*

**Phil Davies**

*So what we talked about there was that we have lateral and lateral-vertical solutions for not just one customer. We are bringing that solution forward, and we have customers looking at that, both of those solutions. And certainly, the number of customers looking at lateral deployment is a little bit higher than the number with lateral-vertical, but we have both.*

**Patrizio Vinciarelli**

*And that's also the way in which systems have evolved, but make no mistake. The future, and the future is coming next year, is no longer with lateral PDNs.*

56.    Another analyst, Richard Shannon also reconfirmed that the prior call had evinced an existing customer relationship, which Vicor denied ever having represented:

**[Analyst] Richard Shannon**

*Hi, Richard Shannon with Craig-Hallum. Let's see, a couple of questions. Maybe a follow-up on the topic of bookings here. I think*

---

*last quarter, you felt fairly confident that the backlogs would improve either in the ending third quarter or fourth quarter. Now, it seems you're less certain of that. And I think if I understood one of the answers to a prior question, you're still expecting the design with a major customer to -- that is still active here. So, it seems like a couple of simple explanations for that would be either that design is delayed or your share of the size of the opportunity is more limited than what you initially had thought or potentially there's other reasons. So, can you help us understand those dynamics relative to your last conference call?*

**Patrizio Vinciarelli**

*I think I made clear that we really don't want to go into the level of detail. And to be clear, well, I appreciate the reason for the interest, the curiosity, it's really got very little to do with Vicor's opportunity in the medium and long term. And that's what we're really focused on.*

57.     The questions make clear that the market and the analysts all heard the same thing on July 25th, and were now hearing the opposite. Vinciarelli's pivot that the customer relationship announced on July 25, 2023, "had very little to do with" Vicor's business "in the medium and long term" is shocking given how gung-ho he had been just three months earlier.

58.     Thus, when pressed to update the public statement made on July 25, 2023, that a "significant" and "existing" customer who had agreed to use two different kinds of implementations at the "1,000 amp level" would ramp up in Q4, Vicor essentially denied the existence of any such customer and pivoted to talk about *no specific customer*, disclosing only that it was "having substantial conversations with customers who will diversify us away from the two big guys we've been doing business with."

59.     In other words, in a mere three-month span, Vicor went from representing

---

that one of the "two big guys" was ramping up a new product with Vicor by Q4 2023, to Vicor talking to other customers so as to not rely on business with the "two big guys."

60.    This corrective disclosure made clear to Plaintiffs and the market that the promised Q4 "ramp in" of a "significant customer" was false when made; investors fled.



61.    As seen in the above figure, the price for Vicor immediately fell over 20%. Vicor closed at $53.19 on October 24, 2023. Following the after-hours earnings call, Vicor opened the next day at $39.01.

62.    Whereas the number of shares trading on the days prior to October 24, 2023, was consistent with the average of around a million, the volume again approached 4.5 million shares on October 25, 2023 (as people exited), and then reverted to the mean days later.

63.    After this lawsuit was filed, Vicor issued a press release to further attempt to cover its tracks. In its statement, Vicor seemingly admitted what it had denied on

October 24, 2023—that it had said there was a large customer. Vicor's press release proceeded to explain that its July 25, 2023 announcement was true because it had just "booked" $30 million in "non-cancellable, non-returnable" orders from the customer, and was a "reflect[ion]" of what Vicor "understood to be" the customer's "allocation for a new program."[10]

64.    The press release confounds more than it explains.

65.    The fact that the press release was released a year *after* the events in question and only because lawsuits had been filed itself is a basis to read the carefully selected verbiage very closely and with extreme skepticism. The details (if they can be called that) should have been disclosed a year before it was made—e.g., between July 25, 2023 and October 24, 2023, or at least as part of the July 25, 2023 call. The fact that they were not is telling.

66.    The fact that the July 25, 2023, announcement that Vicor had landed a significant customer for its new product was predicated on nothing more than Vicor's subjective" understanding of the "customer's plans—and not its actual purchases of product—is likewise telling.

67.    Had Vicor truly "booked" $30 million in sales for its new product in or around July 25, 2023, it naturally would have filed an SEC Form 8-K to announce such a material development. It did not do so.

68.    And once Vicor made the oral announcement on July 25, 2023, it should have filed an SEC Form 8-K announcing the "customer's" decision to reverse the $30 million in supposedly "Non-Cancellable, Non-Returnable orders." The only reason it would not have done so at that time is because the reversal was not a reversal at all. The fact that no 8-K was filed and Vicor tried to cover up that fact in its July 25 announcement

---

[10] https://www.vicorpower.com/press-room/vicor-responds-to-allegations?_gl=1*1inusbc*_up*MQ.*_ga*MTM1ODgwMDI0MC4xNzMyMjA3NjYy*_ga_C8JXV19SQ5*MTczMjIwNzY2MS4xLjEuMTczMjIwNzY3MC4wLjAuMA

goes to Vicor's knowledge and scienter of the falsity that there was a confirmed customer for those orders.

69.     The September 3, 2024 press release attempts to suggest that the bookings were real and non-cancellable, yet it never says when they were actually made, and publicly available court documents reveal no filing of a lawsuit for breach of a $30 million purchase order or supply agreement.

70.     Finally, nowhere did Vicor even attempt to address the real problem—its announcement on the July 2023 call that an existing customer had entered into a new contract for product from Vicor set to start delivering in Q4 2023 had no factual basis.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b -5(b) AGAINST ALL DEFENDANTS

71.     The factual allegations in this Complaint are hereby incorporated by reference as if fully set forth herein.

72.     Plaintiffs' allegations amount to (i) manipulation or deception (through misrepresentation and/or omission); (ii) materiality; (iii) "in connection with" the purchase or sale of securities; (iv) scienter; (v) causation; and (vi) damages.

73.     Based upon the facts alleged herein, Defendants violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchases and sales of Vicor common stock by Plaintiffs: (a) used or employed manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; (c) employed devices, schemes, and artifices to defraud; and/or (d) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon Plaintiffs.

74.     Defendants engaged in a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs and other Class

members, as alleged herein; (ii) artificially inflate and/or maintain the market price of Vicor's shares; and (iii) caused Plaintiffs and other members of the Class to purchase Vicor common stock at artificially inflated and/or maintained prices and or trade in derivatives whose prices themselves and beneficial features were keyed to such prices.

75.    In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, individually and collectively, took the actions set forth herein.

76.    Pursuant to the above plan, scheme, and course of conduct, each Defendant participated directly or indirectly in making the false statements and in the preparation and/or issuance of the annual reports, quarterly results announcements, SEC filings, press releases, and other statements and documents which failed to correct the disclosure. Such reports, filings, releases, and statements contained untrue statements of material facts and/or failed to disclose material information necessary to make the statements made not misleading.

**Deceptive or Misleading Statements of Fact**

77.    Plaintiffs have specifically identified the time, place, manner, and content of the deceptive statements, and why those statements were false.

78.    On July 25, 2023, Vicor represented it had contracts with an existing significant customer that were related to Vicor's newest product and which Vicor would deliver starting in Q4 2023. Vicor's representation was of an existing fact, as it stated that the agreement would solve Vicor's shrinking backlog problem, thereby implying that it had new orders from the customer.

79.    These representations were thus false when made because clearly no such customer existed.

80.    Three months later, Vicor *confirmed* that no such customer existed, pivoting to state that rather than ramping up with their significant existing customer, Vicor was looking to "diversify away" from them, and that the backlog issue was not going to be resolved anytime soon. Vicor failed to correct any of its misstatements in the intervening period, and its SEC filings materially omitted any corrections.

81.    Vicor also failed to explain that there was no concrete deal with such a customer and that it was merely in discussions with such a customer. Or, in the alternative, if there was a concrete deal, Vicor failed to explain any of the risk factors that would allow such a deal to fall apart in a mere three months before a single order.

**Materiality**

82.    Defendants' misrepresentations were material because they fundamentally changed the total mix of information about Vicor in the market and had a direct and immediate impact on market price for Vicor stock and on derivatives keyed to Vicor's stock price.

83.    Right after the false positive news on July 25, 2023, Vicor's stock shot up from $59 to $77.40 literally *overnight*, and the next day over three million shares traded more than normal.

84.    Also, Defendants own press release highlighted the lack of orders and the shrinking backlog of orders, which, absent positive news about a new large customer who would soon be making a large amount of purchases, would have caused the stock to further decline—indeed, the stock nosedived overnight after the corrective disclosure to $39, and the next day again saw over three million more shares trading than normal.

**…In Connection with the Purchase or Sale of Securities**

85.    The false statements were made by Vinciarelli, the CEO of a publicly traded company, during an earnings call covered by analysts, which Defendants knew would be the type of information investors like Plaintiffs or the Class would rely on in deciding to buy or sell Vicor's securities.

86.    The false statements of fact were indeed made in connection with Plaintiffs' short sales and purchases of Vicor's stock to cover their short positions, and in connection with Plaintiffs' purchase and sales of derivative securities keyed to Vicor's stock that were intended to give Plaintiffs further exposure as a short position to Vicor's shares.

**Scienter**

**87.**    Vicor's misrepresentations and omissions were made with actual knowledge of, or (at a minimum) with reckless disregard of, their falsity given the degree of specificity provided in the July 25 press release and on the June 25 earnings call, which were false.

**88.**    Moreover, Vinciarelli and Vicor's Management, who were instrumental in preparing the false statements or omissions, had unlimited access to the facts about Vicor's customer lists, sales, negotiations, contracts, reports, press releases, public filings, and other statements by Vicor.

**89.**    Defendants had such access before and/or after the allegedly false statements were issued and, therefore, had the ability to prevent the issuance of the statements or cause the statements to be corrected immediately.

**90.**    Defendants knew that Vicor's backlog had fallen by 50% when they said as much.

**91.**    They framed their July 25, 2023 announcement as a reversal of that trend because an existing customer agreed to buy new product. This was not a mere hopeful expression of the future, but rather a bad faith (if not outright unsubstantiated) statement of existing fact.

**92.**    When asked about the customer, Defendants represented that this was a significant and existing customer—which the market understood was either Google or Nvidia.

**93.**    Just three months later, during the October investor call, Defendants completely abandoned their assertion regarding the existing customer—they did not offer more color on the development of this supposed deal, and they completely ignored it.

**94.**    It was not until they were directly questioned about it that they attempted to reframe what they said (notwithstanding clear, direct questions) and denied ever having made the representation about the customer.

**95.**    While Vicor announced on July 25, 2023, that it had a new and significant customer, the truth is that whatever deal existed was so tentative and unconsummated that it could fall apart in three months, and Vicor knew—or should have known—as much. For

a deal of this magnitude and importance to fall apart so quickly strongly suggests that Defendants lacked any basis warranting the unqualified assertions of fact made on the July 2023 call.

96.    Then after this lawsuit and others were filed, Vicor once again attempted to re-engineer the facts by making specific representations in a press release about the customer—seemingly confirming (rather than rebutting) the fact that Vicor had jumped the proverbial gun.

97.    By no mere coincidence, in July 2023, Vinciarelli was the largest Vicor shareholder, holding nearly 10 million shares, and had just received over 17,000 Vicor stock options in May 2023. Vicor itself notes that "the concentration of ownership of our Common Stock by Dr. Vinciarelli, our Chairman of the Board, Chief Executive Officer, and President" is a risk factor affecting the stock price, because "Dr. Vinciarelli owns 93.8% of the issued and outstanding shares of our Class B Common Stock, which possess 10 votes per share… As such, Dr. Vinciarelli, controlling in aggregate 80.0% of our outstanding voting securities, has effective control of our governance."[11]

98.    He signs every quarterly and annual statement.

99.    So, it is no surprise that Vinciarelli's personal wealth was directly tied to the stock price – every $10 increase in Vicor's stock represented a $100 million increase in Vinciarelli's personal net worth. In this instance, the stock shot up from $59 to over $94, representing a more than $350 million increase in personal wealth for Vinciarelli. Prior to that, Vicor's fortunes had been on the downswing—the company's shares had traded above $160 a share in 2021, during which time Vinciarelli, per his Form 4 filings, sold over $50 million in shares.

100.    And in the days following the false announcement on July 25, 2023, certain Vicor insiders (directors and management) sold well over $1 million in Vicor shares. Sale prices were inflated by roughly 33%, meaning those insiders were collectively enriched to

---

[11] https://vicorcorporation.gcs-web.com/static-files/3dd8c0e2-9b5f-496f-bbb3-d131f1f98871 at 24.

the tune of over $300,000.

101.    Starting in late 2021 and through July 2023, a large short position of around three million shares developed.

102.    Upon information and belief, Vinciarelli attempted to prevent his own and other Vicor shares from being loaned to short sellers.[12] Using whatever means Defendants could to increase the value of Vicor's shares was obviously intended, at least in part, to lift the price of the stock as a way to self-enrich as well as to combat short sellers, creating a short squeeze.

103.    Defendants made the alleged misstatements while having direct access to the truth of whether Vicor had an agreement with an "existing and significant customer" to purchase the new "next generation" product design in Q4, which they expressed would change Vicor's fortunes.

104.    Defendants had immediate access to the truth: Vicor either did or did not have a deal in place with an "existing" and "significant" customer as of July 25, 2023, to warrant announcing that the sales would materialize in a matter of months (*i.e.*, by Q4 2023).

105.    Vinciarelli's knowing and active participation in making the alleged misrepresentations and omissions, as well as disseminating the false statements to the investing public, is substantial and clear, and specifically evidences his personal knowledge or recklessness.

106.    If Vicor did not have actual knowledge of the misrepresentations and/or omissions alleged, then it was reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading, or by being reckless in failing to install basic controls necessary to ensure that only truthful statements were made.

---

[12] https://seekingalpha.com/article/4736755-vicor-the-growth-stock-that-isnt;
https://seekingalpha.com/article/4588942-a-75-percent-decline-in-vicors-share-price-presents-a-compelling-investment-opportunity

**107.** And given the exposure to the securities laws and the length of time Vicor has been publicly traded, its misrepresentation of the status of the company's relationship with a "significant customer" defies reason—the only reasonable inference is that they knowingly made the statement because they knew Vicor's investors were starved for good news.

**108.** At all relevant times, Vinciarelli acted within the scope of his agency or employment of Vicor as its Chairman and CEO and largest stockholder because he expressly spoke in those capacities on the investor calls when he made those representations or omissions.

**Causation**

**109.** The false statements were the only positive news released on or around July 25, 2023, that could account for the stock price rise and were the first positive news for Vicor in several quarters.

**110.** This good news would foreseeably result in a rise in Vicor's stock price and did produce such a result.

**111.** The announcement also would foreseeably result in an artificially inflated stock price for Vicor and did result in an artificially inflated stock price.

**112.** The timing of the stock price reactions and the four-and-a-half times rise in trading volumes, coupled with the nature of the news viz-à-viz the other information about Vicor's business's health, are direct evidence that the false statements caused the price of Vicor's common shares to skyrocket after the July 25, 2023 earnings call.

**113.** Indeed, when the news was reversed during the October earnings call, the stock price immediately fell, and trading volume again increased precipitously (by roughly) four-and-a-half times the norm.

**114.** Because the derivative securities at issue have prices keyed to the price of the underlying Vicor stock, the false statements affected not only the decision to trade in those derivatives but the relied-upon market prices that affect their value.

**115.** At the time of the above misrepresentations and omissions, Plaintiffs could

not have known of their falsity and believed them to be true.

**116.**    Each Plaintiff relied on the truth of the statements made during the July 2023 investor call and/or relied on the impact that the announcement had on the market price for Vicor's securities in deciding to cover their short positions—or being forced to do so and/or incurring the costs of doing so—including selling other profitable positions to cover the difference.

**Reliance**

**117.**    Had each Plaintiff and/or the marketplace known of the truth regarding the lack of a significant customer ramping up with a new generation product in Q4, Plaintiffs would not have purchased Vicor's shares, or, if they had purchased them eventually to cover their short positions, they would not have done so at the artificially inflated and/or maintained prices they received to cover their short positions.

**Damages**

**118.**    As a direct and proximate cause of their violations, Plaintiffs suffered damages in connection with their purchases and sales of Vicor stock.

**119.**    Each Plaintiff is entitled to damages equal to (a) the cost to cover based on the market's reaction to the fraudulent statements and the consequences of doing so (including liquidation), and (b) the lost gain each Plaintiff would have experienced from the stock falling to, at least, $32 the way it did in the weeks after the corrective disclosure.[13]

**Efficient Market for Vicor Securities**

**120.**    There is a liquid market for Vicor's shares and derivatives, given that they are traded on a major stock exchange—NASDAQ—which is a highly efficient and liquid automated market with rules for minimum liquidity.

**121.**    On the days in question, large volumes of trades were made.

**122.**    Furthermore, as reflected in Exhibit A, there is a robust market for derivative securities related to Vicor's shares.

---

[13] *See* Exhibit A incorporated herein.

123.    Vicor is an SEC reporting company in good standing with several analysts actively following the stock. As a result, and as reflected in the trading data above, the market for Vicor's shares promptly digested then-current information regarding Vicor's business from all publicly available sources and reflected such information in the market prices for the stock.

124.    Given the foregoing, Vicor and Vinciarelli each violated Section 10(b) of the Exchange Act and Rule 10b-5 by making false statements and omitting to correct any misstatements to make them not materially misleading.

125.    Defendants are liable directly and indirectly for their violations of Section 10(b) and Rule 10b-5 for the wrongs complained of herein in connection with Plaintiffs' purchases and sales of Vicor's stock.

### COUNT TWO
#### VIOLATIONS OF SECTION 20 OF THE EXCHANGE ACT
#### AGAINST DEFENDANT VINCIARELLI

126.    The factual allegations in this Complaint are hereby incorporated by reference as if fully set forth herein as is the theory of liability for Count One.

127.    Vinciarelli acted as a controlling person of Vicor within the meaning of Section 20(a) of the Exchange Act as alleged herein.

128.    Vinciarelli, acting as Vicor's CEO and President, made the misrepresentations on behalf of Vicor, and personally stood to gain hundreds of millions of dollars from the foreseeable rise in the price of Vicor's stock.

129.    By virtue of his high-level positions at Vicor, participation in and/or awareness of the company's operations, and direct knowledge of the false statements he personally made on behalf of the company to the public investors during an investor analyst phone call, Vinciarelli had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vicor, including the content and dissemination of the various statements Plaintiffs contend are false and misleading.

**130.**   For example, as of March 31, 2023, Vinciarelli, as CEO, had recently "conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the last fiscal quarter[.]"[14]

**131.**   Vinciarelli was provided with or had unlimited access to Vicor's contracts, reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**132.**   Vinciarelli either had actual knowledge of the false impression given or was reckless in not knowing.

**133.**   Therefore, Vinciarelli is liable personally as a control person under Section 20 of the Exchange Act.

**134.**   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and sales of Vicor's common stock and derivatives.

## CLASS ALLEGATIONS

**135.**   Plaintiffs propose a class certified under Rule 23(b)(3) to represent themselves and all those similarly situated for all persons who took short positions in Vicor's common stock prior to and on July 25, 2023, and covered their short positions in the days following and including October 24, 2023 (the "Class Period").

**136.**   Plaintiffs believe that, given the number of shares traded and the short position right before July 25, 2023, the number of potential class members is so numerous that it would be impractical to join all potential Class members. Specifically, upon information and belief, approximately three million shares were short as of July 15, 2023,[15] suggesting that there are hundreds if not thousands of short sellers.

---

[14] https://vicorcorporation.gcs-web.com/static-files/fc6d988d-9b13-4388-a634-b64b8af13385 pg 24.

[15] https://www.nasdaq.com/market-activity/stocks/vicr/short-interest; https://www.marketbeat.com/stocks/NASDAQ/VICR/short-interest/.

137.    Plaintiffs are typical of the members of the Class because they shorted the stock and then covered their shorts on or after July 26, 2023. Upon information and belief, no Plaintiff or Class member is subject to a unique defense or claim.

138.    Plaintiffs are adequate to represent the Class because they have no conflicts of interest, have no interests other than those in their own claims, and have hired competent and experienced class counsel.

139.    All Class members have suffered the same injury, although damages may differ, and so the following represent common questions for the class:

- Whether Vicor made material misrepresentations of fact on or about July 25, 2023, with regards to Vicor's prospects involving an existing customer who would be "ramped in" by Q4;

- Whether Vicor's misrepresentations were knowingly or recklessly made;

- Whether Vicor's misrepresentations inflated Vicor's market price;

- Whether Vicor's misrepresentations proximately caused Plaintiffs' and the Class' damages and the general extent of such damages; and

- Whether the acts or omissions herein violated Sections 10(b) and 20 of the Exchange Act and Rule 10b-5.

140.    Bringing all claims of the Class is superior in a single action than would be in multiple actions for the fair and efficient adjudication of all claims and since joinder of all claims would be impracticable. It is also superior because for many plaintiffs and Class members, the individual claims are relatively small in comparison to the costs of litigation, making the burden and expense of individualized litigation prohibitive if each claim were to be pursued on its own.

141.    There will be little difficulty in managing this lawsuit as a class action.

142.    The Class would be entitled to a presumption of reliance on the fraud-on-market theory under *Basic v. Levinson*, 485 U.S. 224 (1988). As already pleaded, Plaintiffs and the Class purchased the Vicor shares relying on the integrity of the market price for Vicor's shares, as reflected by the information available to the market. There is a liquid market for Vicor's shares given that the shares are traded on a major stock exchange—NASDAQ—which is a highly efficient and liquid automated market with rules for minimum liquidity. The stock is actively traded. And Vicor is an SEC reporting company in good standing with several analysts actively following the stock. As a result of the foregoing, and as reflected in the trading data above, the market for Vicor's shares promptly digested current information regarding Vicor's business from all publicly available sources and accurately reflected such information in the market prices for the stock. Under these circumstances, purchasers of Vicor's shares during the Class Period suffered similar injuries through their purchases. Therefore, Plaintiffs and the Class are entitled to a presumption of reliance under *Basic v. Levinson*.

143.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Whatever kernel of truth there may have been in the statements made on July 25, 2023, Defendants made material omissions in describing or properly qualifying what they were representing in order to make their statements not materially false or misleading.

144.    Because this action involves Defendants' failure to disclose materially adverse information regarding Vicor's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not required to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## JURY DEMAND

145.    Plaintiffs demand a trial by jury on all issues so triable.

1

## **PRAYER FOR RELIEF**

2      **146.**    Plaintiffs request that the Court enter an order certifying a class, enter final

3  judgment finding Defendants liable, and award Plaintiffs damages for their losses in an

4  amount determined by the trier of fact, as well as attorneys' fees, expert fees, costs and

5  expenses, as permitted under law or equity, and all other relief to which they are entitled

6  and/or that the Court deems just, legal, equitable and proper.

7

8

9  Dated: November 22, 2024                    **SBAITI & COMPANY, PLLC**

10                                                          _/s/  Mazin A. Sbaiti_____
                                                            Counsel for Plaintiffs
11                                                          Email: mas@sbaitilaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28