UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE VICOR SECURITIES LITIGATION | Case No. 24-cv-04196-RS <br><br> **ORDER GRANTING MOTION TO DISMISS** |

# I. INTRODUCTION

In this case, a putative class of short-sellers have sued a publicly traded corporation over alleged misrepresentations that spurred a dramatic rise in values. Plaintiffs aver that, when these alleged misrepresentations came to light, stock prices plummeted. Having had to cover their short positions in light of the initial rise, Plaintiffs seek damages under the Exchange Act. Defendants move to dismiss the allegations, contending that no misrepresentations were made and that, at any rate, they lacked the necessary scienter to be found liable. For the reasons explained below, Defendants' motion is granted, and the operative complaint is dismissed with leave to amend.

# II. BACKGROUND

According to Plaintiffs' first amended complaint ("FAC"), Dkt. No. 27, Defendant Patrizio Vinciarelli is the founder and CEO of Defendant Vicor Corporation, which designs, develops, manufactures, and markets modular power components and power systems for deployment in areas such as high-performance computing, industrial equipment automation, robotics, satellites, and more. Plaintiffs aver that, starting in 2022, Vicor's stock slid 20% in value when it was

revealed that Nvidia, another tech company, would not be using Vicor's designs in its new artificial intelligence ("AI") computer chips. Previously, Vicor's two largest customers had been Nvidia and Google. By May 2023, the company was reporting decreased net revenues and accounts receivable—leading Plaintiffs to take short positions on the company's stock.

On July 25, 2023, Vicor released its second quarter earnings report, which featured the following statement, attributed to Vinciarelli:

> Q2 bookings remained weak, ahead of production release of an AI platform with a Lateral Power Distribution Network ('PDN') **using a 4G Chipset, now expected to ramp in Q4.** The same 4G Chipset will support a more adept Lateral-Vertical PDN, enabling a reduction of nearly 100W in total power consumption at heavy workloads and superior processor performance.

FAC ¶ 32 (emphasis added). Later that day, Vinciarelli spoke to investors and analysts on an earnings call. One analyst asked whether the expected "ramp" was from a new customer. Vinciarelli responded:

> **It's an existing customer. It's a new generation for the existing customer.** And it's a chipset that can be deployed either in a lateral PDN, which is substantially handicapped from a power system perspective to the point that it limits power delivery, power capability, process of performance, in that it gives rise to large losses within the copper of the substrate to the GPU, that it powers. It gives rise to further losses within the system itself, or into the limitations of lateral power delivery applied at the 1,000 amp level. With a 4G chipset, we can enable a lateral solution with the same handicaps, or with a vertical element using the same chipset, a lateral vertical solution, which is unique, highly differentiated, in that it improves system efficiency by about 10%. And it improves a number of limitations relating to process of performance.

*Id.* ¶ 36 (emphasis added). When another analyst inquired about the "lateral vertical opportunity" described in the press release, Vinciarelli elaborated that, "Based on customer input expectation, as of now . . . the lateral implementation will go first. And that's the one we're anticipating for Q4 ramp. I can't tell you when the lateral vertical was going to production, but my expectation is that it would be after the lateral." The analyst asked, "is this going to be a significant customer or is this more of an incremental volume that you're going to expect?" Vinciarelli answered, "This is a significant customer." *Id.* ¶ 38.

Plaintiffs aver that the above statements—the press release, the earnings call statement about an existing customer, and the related statement about the customer being a significant one— "gave the unmistakable impression that a concrete deal had been reached for an existing—not speculative—large customer of a significant number of purchases in the fourth quarter, which would have reversed Vicor's trend of declining and weak sales." *Id.* ¶ 43. The market apparently reacted: whereas stocks closed on July 25, 2023 at $59 per share, they opened the next morning at $77.40 and closed at $93.70—after more than 4.5 million shares had changed hands, 5x more than average. Plaintiffs, who had shorted Vicor stock, claim that they were forced to cover their positions at a significant loss of $35 per share on average, plus approximately $15 per share they think they would have realized but for the need to cover. *Id.* ¶¶ 45–47.

Everything changed a few months later, when Vicor held its third quarter earnings call in October 2023. Asked about the significant, existing customer that it had touted as driving the expected fourth quarter ramp, Vicor's VP of Sales Phil Davies said "we're having substantial conversations now with customers that will diversify us away from the two big guys that we've been doing business with[.]" *Id.* ¶ 53. Another analyst chimed in, asking, "with the one major customer though, do they have two different designs with you? . . . two different GPUs that are going to be used, in one using lateral, the other's going to be using lateral-vertical?" and Vinciarelli responded by addressing the analyst by name: "John, we're not going to talk about any one customer. I'm sorry but bear with us, that's not a level of specificity we want to get involved with." The analyst, John Dillon from Goldman Sachs, reiterated the question about "a major GPU customer," and Davies answered him as follows:

> So what we talked about there was that we have lateral and lateral-vertical solutions for not just one customer. We are bringing that solution forward, and we have customers looking at that, both of those solutions. And certainly, the number of customers looking at lateral deployment is a little bit higher than the number with lateral-vertical, but we have both.

*Id.* ¶ 55. A different analyst later chimed in about the "major customer," asking about the "Dynamics relative to your last call," and Vinciarelli said, "I think I made clear that we really

don't want to go into the level of detail.  And to be clear, well, I appreciate the reason for the interest, the curiosity, it's really got very little to do with Vicor's opportunity in the medium and long term.  And that's what we're really focused on." *Id.* ¶ 56.

After the October 2023 call, investors fled.  Vicor stock dropped over 20% and closed at $53.19 per share that day; the next day, trading opened at $39.01.  Nearly a year later—and after the filing of the instant litigation—Vicor put out a press release explaining that its July 2023 announcement was true: it had "booked" $30 million in "non-cancellable, non-returnable" orders from the customer, and its statement reflected what Vicor "understood to be" the customer's "allocation for a new program." *Id.* ¶ 63 (discussing September 2024 press release).

Plaintiffs assert two claims: one claim under Section 10(b) of the Exchange Act and Rule 10b-5(b), and a separate claim (against Vinciarelli personally) under Section 20 of the Exchange Act.  As to the first claim, Plaintiffs aver manipulation or deception that was material and "in connection with" the purchase or sale of securities, made with scienter in a way that caused damages.  As to the second claim, Plaintiffs aver that Vinciarelli acted as the controlling person of Vicor and made misrepresentations with scienter such that he is liable personally as a control person.

Defendants move to dismiss the complaint on four grounds:

1. No facts pleaded support any inference that any statement by Vicor or Vinciarelli was false or misleading when made;
2. No facts pleaded support any inference of scienter, much less the strong inference required under the PSLRA;
3. No plausible theory in which Plaintiffs, all short-sellers betting against Vicor, could have relied on Defendants' allegedly misleading statements; and
4. Failure to state a "control person" claim under Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78t(a).

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the nonmovant. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555 ("Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice.")).

Complaints in securities fraud cases must also meet the pleading standards set forth by the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA mandates that "securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)–(2)). Furthermore, securities claims which are "grounded in fraud" must meet the pleading requirements of Rule 9(b). *In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of

ORDER GRANTING MOTION TO DISMISS
CASE NO. 24-cv-04196-RS
5

1   the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent]

2   statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

3   1047, 1055 (9th Cir. 2011) (internal quotation marks omitted) (alteration in original).

## IV. DISCUSSION

### A. Section 10(b) and Rule 10b-5

"To be viable, a claim brought under § 10(b) and Rule 10b-5 must contain six essential elements: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)). Defendants argue that Plaintiffs' complaint fails to meet that standard in three specific ways: (1) failure to plead any material, misleading statement; (2) failure to plead scienter; (3) failure to plead reliance on the allegedly misleading statements.

### 1. Material, Misleading Statements

To plead falsity adequately under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This means "Plaintiffs must plead with particularity which statements were made, when they were made, why they were false at the time they were made, and how the Defendant who made the statement acted with scienter at the time the statements were made." *Veal v. LendingClub Corp.*, 423 F.Supp.3d 785, 819 (N.D. Cal. 2019). Defendants contend that Plaintiffs' complaint fails plead with particularity why the statements described in the complaint were false when they were made.

Plaintiffs respond with a lengthy explanation of how, when Defendants said they "expected to ramp in Q4" an AI platform with a 4G ChiP-set, they gave the false impression that Vicor had

an actual customer who had agreed to make new purchases. Opp. Br., Dkt. No. 37, at 12–15. Plaintiffs believe this message was cemented by Vinciarelli's subsequent statements about a significant, existing customer driving the ramp. This message must have been clearly delivered, Plaintiffs claim, given the stock trading that occurred on the heels of the call. The complaint states "Vicor represented it had contracts with an existing significant customer that were related to Vicor's newest product and which Vicor would deliver starting in Q4 2023." FAC at ¶ 78. *See also id.* at ¶ 40 ("had agreed to make product purchases"), ¶ 43 ("concrete deal"). Yet, according to Plaintiffs, this was all a lie—there was no such concrete deal with an existing customer.

Defendants rightly highlight that many of the above characterizations are incorrect: they never said anything about contracts or agreements or concrete deals. To the contrary, they were clear that they only "expected" to ramp—i.e., they had "anticipat[ion]"— based on "customer inputs." As Defendants fairly summarize, "This lawsuit is based purely on the disclosure of an anticipated future business opportunity that did not materialize in the expected time frame." Mot. at 12. Once the recharacterizations in the operative complaint are stripped away, the allegedly misleading statements at issue reduce to the following: (1) that Vicor "Expected to ramp in Q4" a new AI platform using a 4G ChiP-set; (2) that the platform was a "new generation for the existing customer" and (3) that the customer was a "significant" one.

Plaintiffs contend that these disclosures must have been false when made because, during the subsequent October 2023 call, Vicor's top brass backed away from discussing the Q4 ramp and signaled, apparently for the first time, a plan to diversify its customer base. Framing this retreat as a "cover up", Plaintiffs provide one relevant case as support for the proposition that allegations supporting the existence of an alleged cover-up of a fraud are relevant to inferring falsity. *See SEC v. Dropil, Inc.*, No. 20-cv-00793-SBD-FMX, 2020 WL 7348021, at *6 (C.D. Cal. Oct. 23, 2020). The cited language, however, describes how a detailed explanation "of allegedly material misrepresentations that define the contours of the scheme and subsequent cover up" can support an "inference of scienter". *Id.* That statement does not support the premise that alleging a cover-up satisfies the material misrepresentation element of a PSLRA claim; to the contrary, it

ORDER GRANTING MOTION TO DISMISS
CASE NO. 24-cv-04196-RS

suggests that a cover-up allegation, *combined with details about allegedly false statements*, can suffice to satisfy the *scienter* element. In that case, the SEC detailed four ways in which the Defendant had misrepresented aspects of its securities' offerings. *Id.* at *2. Those allegations, taken together with related allegations of fabricated responses to subpoenas, sufficed to state a claim. In the present case, such details and allegations are entirely absent. The mere averment that Defendants changed their tune in Q3 does not suffice to allege material misrepresentations occurred in Q2.

Moreover, even if it were true that alleging a cover-up supports the inference of falsity, no facts in the complaint plausibly aver anything to cover-up. Plaintiffs seem to suggest that the July 2023 announcement was a market manipulation to enable insider trading. FAC ¶ 100 (averring that, following the announcement, "Vicor insiders . . . sold well over $1 million in Vicor shares"); ¶ 102 ("Vinciarelli attempted to prevent his own and other Vicor shares from being loaned to short sellers. Using whatever means Defendants could to increase the value of Vicor's shares was obviously intended, at least in part, to lift the price of the stock as a way to self-enrich as well as to combat short sellers, creating a short squeeze.") These speculative and conclusory allegations, however, fail to aver plausibly a material misstatement. Indeed, they do not explain why it is not equally as plausible that Vinciarelli was being optimistic. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (concluding that statements regarding the defendant's expectations may have been "overly optimistic when made," but they did "not rise to the level of material misrepresentation actionable after enactment of the PSLRA"). Even taken as true, the averment that insiders traded heavily following the July 2023 call does not, standing alone, suggest that the news on the call was false; it just as easily suggests that the insiders who allegedly traded *believed* the news to be true.

Plaintiffs next contend that, even if Vicor never technically used the terms "orders" or contracts," it is still liable if it "gave a misleading impression" as alleged in the complaint. Opp. Br. at 18. Yet, the cases Plaintiffs cite in support of that notion are inapt. In one, the Ninth Circuit simply confirmed that, where a complaint identified four confidential witnesses who would testify

as to the falsity of certain statements, the material misrepresentation element was met. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). No such facts are present here. In the other, the Ninth Circuit acknowledged that "even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018). Here, there is no plausible averment in the complaint that Defendants' announcement of expectations omitted material information. Plaintiffs claim Vicor "never disclosed the truth about the customer or the nature of their discussions, and only later disclosed that it had nothing concrete at the time and had merely announced the deal with the significant customer without a placement of firm orders." Opp. Br. at 18. This conclusory allegation is unsupported—the complaint provides no basis on which to conclude that Vicor "had nothing concrete" or that it hid that fact such that it committed any material omission.

Finally, it bears mentioning that the PSLRA provides a safe harbor for forward looking statements, such as "a projection" of revenues, a "statement of the plans and objectives of management for future operations," or "any statement of the assumptions underlying or relating to" any forward-looking statement. *See* 15 U.S.C. § 78u-5(i)(1); *see also*, *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (affirming finding that a statement was a "forward-looking statement" because it was a statement that meant "things were looking up"). This safe harbor applies where a statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements" or where the statement is "immaterial." 15 U.S.C. §§ 78u-5(c)(1)(A). To satisfy the safe harbor, cautionary language must only appear once per presentation or document, not directly before every single statement being challenged. *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1242 (N.D. Cal. 1998).

Defendants provided appropriate cautionary language with both the press release and during the July 2023 call. The language was clear: "Any statement in this press release that is not a statement of historical facts is a forward-looking statement" and is "based upon management's current expectations and estimates as to the prospective events and circumstances that may or may

not be within the company's control and as to which there can be no assurance." Vinciarelli Decl. Ex. 3, Dkt. No. 32-4 at 5.  At the beginning of the call, investors and the public were warned that "various remarks we make during this call may constitute forward-looking statements for purposes of the safe harbor provisions under the Private Securities Litigation Reform Act of 1995 . . . we can offer no assurances that any forward-looking statement will, in fact, prove to be correct. Actual results may differ materially from those explicitly set forth in or implied by any of our remarks today…." Vinciarelli Decl. Ex. 4 at 1:26–2:51.  '

        Plaintiffs halfheartedly suggest that Defendants fail to explain the forward-looking nature of the at-issue statements, but on their face, the statements are *necessarily* forward looking; they came in Q2 yet concerned Q4, and they revolved around the words "expect" and "anticipate."  The statements about an existing, significant customer are only relevant to these forward-looking projections of what was to come.  Plaintiffs next try to recharacterize what was said—"Vicor announced it had a deal with Nvidia or Google for Vicor's new ChiP-set, which was concrete enough that Vicor acknowledged the Q4 ramp," Opp. Br. at 20—but, as noted *supra*, nothing of the sort was actually said.  Defendants announced that they expected a Q4 ramp due to inputs from an existing, significant customer; that's it.  The press-release disclosure specifically says words like "expects" or "anticipates" are ones that "identify forward-looking statements." Dkt. No. 32-4 at 5.  The call disclosure stated that "any statements regarding current and planned products, current and potential customers . . . as well as management's expectations for sales growth . . . are forward-looking statements . . . we can offer no assurances that any forward-looking statement will, in fact, prove to be correct." Dkt. No. 32-5 at 1:26-2:51.  Combined, these disclosures and the forward-looking nature of the at-issue statements place them outside the ambit of the PSLRA.

        Ultimately, Plaintiffs fail to allege facts giving rise to a plausible inference that material misstatements were made.  The actual verbiage used by Vicor and Vinciarelli was plainly forward-looking, and there is nothing in the complaint to support a finding that those forward-looking statements were false when made.

*2. Scienter*

To plead scienter adequately under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). A "strong inference" exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). A dual inquiry applies for assessing whether the strong inference standard is met: the court first "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009)).

None of the complaint's allegations, standing alone, give rise to a strong inference of scienter. It primarily contends that element is proven by the specificity of Defendants' statements and the fact that they would have had records to clue them into the uncertain nature of the expected Q4 ramp. Yet, these averments are insufficient plausibly to allege the scienter required by the PSLRA. "Plaintiffs do not provide any specific facts, documents, reports, or sources to show that Defendants had information contrary to what was projected in their press release statements. Without such specifics, the Court cannot ascertain whether there is any basis to the allegations that Defendants had actual or constructive knowledge" of adverse facts." *Stocke v. Shuffle Master*, *Inc.*, 615 F.Supp.2d 1180, 1188 (D. Nev. 2009) (internal citation omitted). Even a holistic review of the allegations fails to give rise a strong inference of scienter.

Plaintiffs argue in the alternative that Vicor's statements were made with reckless disregard of their falsity. "For a deal of this magnitude and importance to fall apart so quickly strongly suggests that Defendants lacked any basis warranting the unqualified assertions of fact made on the [call]." FAC ¶ 95. *See also id.* ¶ 106 ("If Vicor did not have actual knowledge of the

misrepresentation and/or omissions alleged, then it was reckless in failing to obtain such knowledge."). These allegations suffer fatal flaws. First, they mischaracterize what Vicor actually said, which was merely that it expected to ramp up production of a new system for an existing, substantial customer—not that there was a done deal of particular magnitude and importance. Second, they rely on an unfounded premise that the news must have been false because the expected ramp did not occur as expected. It is just as plausible that the news was true and then things changed.[1]

At bottom, Plaintiffs' complaint is rife with conclusory allegations about Defendants' knowledge and intent in making the July 2023 statements. Once such conclusions are set aside, the remaining allegations in the complaint fail plausibly to aver that Defendants acted with scienter.

*3. Reliance*

Reliance is generally presumed when the statement in question was issued to the public, though that presumption is rebuttable where it is completely implausible that any reasonable investor could have relied on the statement in purchasing the securities. *See In re Infineon Techs. A.G. Sec. Litig.*, 266 F.R.D. 386, 395 (N.D. Cal. 2009) ("A presumption of reliance cannot exist where such a presumption would be unreasonable."). Because Plaintiffs are short-sellers, Defendants contend that they could not have relied on the market price for Vicor stock nor Defendants' statement—they were betting *against* the company. *See Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 823 (3d Cir. 1988) (declining to presume reliance on the part of a short seller and stating that "since [the plaintiff] decided that the market price was not an accurate valuation of the stock at the time of his short sale, we should not presume that it was reasonable for him to rely

---

[1] Plaintiffs also aver that Vinciarelli had scienter because he is the Chairman of the Board and CEO of Vicor. FAC ¶ 97. Scienter, however, may not be inferred solely from an individual defendant's position within the company. *See Zucco Partners*, 552 F.3d at 998. Nor may it be inferred solely from the fact that he signed certain financial statements. *Id.* at 1003–04. As for the hinted-at insider trading allegations, the Complaint never connects Vinciarelli or any identified individual to the alleged trading.

ORDER GRANTING MOTION TO DISMISS
CASE NO. 24-cv-04196-RS

upon the market price at the time of his purchase."). Plaintiffs respond that, although they rely on a fraud on the market theory for class-wide reliance, the named Plaintiffs have pleaded direct reliance on the July 2023 statements. *See* FAC at ¶¶115–17. Defendants suggest that whether short-sellers are entitled to the presumption of reliance, and whether they can even assert a securities fraud claim as a putative class, may be open questions in the Ninth Circuit. *See* Mot. at 21 n.23.

Because the complaint fails to allege plausibly both the material representation and scienter elements of the claim, this order does not reach the question of whether reliance was sufficiently alleged to state a claim.

### B.  Section 20

Defendant also argues that Plaintiffs fail to state a "Control Person" claim pursuant to 15 U.S.C. § 78t(a). "Under Section 20(a), a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *Inchen Huang v. Higgins*, 443 F.Supp.3d 1031, 1059 (N.D. Cal. 2020) (internal quotation marks and citation omitted).

For the reasons explained above, Plaintiffs have failed to plead plausibly that there was a primary violation of federal securities law in this case. As a result, the control person claim against Vinciarelli necessarily fails in parallel.

### V. CONCLUSION

Because the operative complaint fails to aver plausibly any material misstatements or scienter as required by the PSLRA, Defendants' motion to dismiss is granted with leave to amend.

**IT IS SO ORDERED**.

Dated: June 6, 2025

_____
RICHARD SEEBORG
Chief United States District Judge